What I would like to do this morning is simply give a bit of context to the arguments that have been briefed by both parties, because, of course, I know the Court is well aware of the various contentions. Each of the appellant's contentions are based on the methodology used by the district court in calculating an alternative market value of Westview. I have an overall methodology problem with this case, and it's a part you seem to accept, so it will take me a little bit of time to tell you what it is. The appraiser, Tuerck's report arrived at a value of $1,288,046 by using a particular methodology. One piece of it was, let's say, adjusted net worth, called balance sheet, whatever you want, an adjusted net worth piece, a sustainable earnings piece, and an excess earnings piece. And put those all together, giving only 40% weight to the adjusted net worth part. It comes out ultimately with $1,280, which I'm guessing is what's rounded off the dealing with it. The whole methodology, it looks like, that the district court uses starts with the $1,280 and then makes what looks to me like adjusted net worth additions or subtractions, but does not take off the 60%, which one would have to if you're following the original methodology. When I read your argument, I don't see you, I don't see anything there saying, look, there's something wrong with that. You're arguing about details, but I don't see anything. There's something wrong with taking the appraiser's value and then adjusting it as if the value were all adjusted net worth, which it is not. Is that too complicated? No, it's not. It is part of the general confusion that I think was created by the district court's ultimate findings of fact and conclusions of law. That confusion is in your brief on appeal, too, right? Is it not? Yes, it is. I will concede that. It really is sort of a mixture of apples and oranges in the way it interprets Turk's initial assessment and basically seems to ignore the trial report that Turk prepared, that did provide a consistent application. The court, as well, basically ignored the valuation or rejected it in whole that the government proffered at trial. I believe that a substantial amount of the difference between Turk's valuation and the district court's reflects a misunderstanding as to the nature of Turk's initial valuation. Again, because he could not come to a final total with respect to the market value in light of the pending tax liability, he did not produce a market value determination. Why don't you go back, though? I don't think you're really addressing Judge Fernandez's question. Do you agree with his analysis? I do. There's a potential methodological problem with the way the district court uses the Turk evaluation based on the adjusted net worth considerations. Yes, I would agree with that. I would also concede, however, that that argument is not directly asserted. What I would contend is that it's part of the general flawed methodology, if you will, argument. And that is reflected in a couple of different places. I think most notably in this particular matter is the unexplained failure of the district court to apply any discount rate to the value determined. I don't see how that has to do with the calculation methodology. But this this would bother me that I can't make any sense out of any of this case at this point. I think you folks argued at one point, well, the district court should not have considered the. The income excess, which it added back in because that's already taken up in the other two parts of the methodology. Under the earnings or excess earnings already considered fabulous excess earnings. I don't see how that makes any sense. That cuts any eyes. The adjusted net worth is a totally different calculation. You could add it back in as long as you took off 60 percent. On the adjusted net worth calculation. So. So your argument is making that other argument. And I'm not seeing how that fits with what the appraiser did. For example. I can't really provide a better explanation than than what I tried to do. That's we certainly do not address the nature of the fact that Turk's initial report basically segregated or arrived at a composite value that was not solely based on the net market determination. How do you deal with the compensation? You say shouldn't have been added back into the balance sheet. Why shouldn't it have been added back in? Sound like it should have. It's a separate calculation. It is a separate type of compensation issue, if you will, or asset of the corporation or company. Our basic arguments about that excess compensation issue are that they were not properly before the court as a result of the pretrial conference order. And more importantly, that they were based on the notion that a an assessment of the that the shareholders would have been successful and completely successful in bringing a shareholder derivative action to recover those funds. That was just basically created in whole cloth by the district court and was never argued or in argue proved to that court. If I can briefly go through the summary analysis here. As a result of the district courts, I'm basically going to focus on two of the what we propose are the errors. As a result of the district courts treatment of, let's go backwards. Assuming the court was right to adopt the Turk valuation at 1.28 million, the overcompensation issue of 380,000, and the issue of repayment to Mrs. Smith of 1.6 million. If you add all those up, you get a gross value of 3 million and a quarter, basically. I think it's 3260. At the time of the dispersal of the plan, there was a pending tax assessment or claim against the company that sought 3.7 million. Now, it's true that a sophisticated investor would probably have slightly or would have discounted the amount of that liability, but we would submit that the notion that a company would be assessed a value of $2 million where the estimated liability or the tax claim in fact exceeded the value of the company. And I'll save time for the book. All right. Thank you, counsel. Ms. Perry? Good morning. My name is Gail Perry, and I represent the United States Department of Labor. With respect to this appeal, Your Honors, the primary issue is whether or not the district court committed a clearly erroneous error in the calculation for the loss with respect to the ESOP stock. I've noticed that the defendants, the appellants, do not dispute any of the underlying facts with respect to the district court's findings of the fiduciary violations under 404 and 406. That is a given. What the district court did is it considered all of the evidence and credited the TORC original evaluation, found that it was appropriate, minus the errors. How does that make any sense, though? I mean, you said the district ‑‑ I don't see how the district court can fail to clearly error if it credits the evaluation by just pulling a number out of the air, which is what it seems to do if it credits the evaluation but doesn't credit the methodology that gets to it. It doesn't make any sense at all to me. Well, I think what the district court did is I think the district court looked at all of the evidence and saw ‑‑ It took precisely, and I think that's the way you first trapped it. It took precisely, almost precisely, the number that TORC came up with on its evaluation, 1,280,000. Yes. That was it. It took that number. But that number was arrived at by, among other things, discounting the adjusted net worth by 60 percent. So how do you take ‑‑ how do you say, well, we're going to change the adjusted net worth, but we're not going to take the discount if we think that we're following taking the number that he came up with? Okay. I think I can make that hopefully clear to this Court. First of all, I think what the district court did is after looking at all of the evidence, considering all of the experts' reports, looked and found that Mr. TORC's original evaluation was the most appropriate based on the information that was given to him. Then the Court made certain adjustments upward and downward with respect to its findings of the ‑‑ To the balance, to the adjusted net worth. To the adjusted net worth. And I think that the Court, I think what the Court did is that it did a balancing, and you're looking at restitution here. You're looking at the Court being able to use its discretion to accept certain figures and then make adjustments. I think it was a very complicated case on what happened with information being withheld, material information. It can accept figures willy‑nilly. It can say, oh, well, I was looking through the TORC thing, and one time TORC said $1,100,000. I think I'll take that number just for fun. I like that number. Well, I don't think the Court just said, I like that number. I think the Court ‑‑ It did. It took the 1,280. That was the valuation that TORC put on it. Well, that's true. But I think that what the Court did was the Court looked at all of the evidence, considered both experts. Now, Mr. TORC was the same person who gave the original valuation, and he also gave the expert evaluation at trial. I mean, Mr. TORC clearly flip‑flopped. What I'd like the Court to see is that if he found the original TORC valuation to be reasonable and appropriate based on the But what he did do then after is to make adjustments for Isn't that the problem? I mean, I think that's Judge Fernandez's question, is that if ‑‑ Do you think that the District Court's adjustments were proper in light of the fact that in the original TORC report adjustments were made? In other words, you can't adjust twice for the same thing. Well, I think that what the District Court then was I would like to move on to talk about these adjustments. One of the adjustments was for the overcompensation, the excessive compensation. The District Court at page 7 in the proposed fact, I mean, in the findings of fact and conclusions of law, does a calculation. It actually discounts for the overcompensation. It takes into account that Mr. TORC normalized an annual salary of I think it was $100,000. Now that was a guess on TORC's part because he wasn't provided with all the essential information. He didn't know what the IRS had found. So the District Court found that Mr. TORC's $500,000 was acceptable, did a discounting of that because he comes up with a figure of $1.3 million. And even though I can't remember all of the facts clearly, but at page 7 the District Court says that we're going to make a conservative estimate of what was improper, was an improper portion of the compensation and a proper portion of the compensation. That it's difficult to separate those out. So he does his, he does a multiplication by 62.98% on a figure. But he does come up with a figure that says, based on all the information I have to date, that at least $850,000 of that was overcompensation. And then he further reduces that amount by saying, if under corporate law, California corporation law, a hypothetical derivative action, we find, I find that it would have been successful and therefore we'll subtract attorney's fees from it. In fact, what the District Court did, I think it leaned over backwards to help out the appellants. Despite the gross negligence that it's found, the gross conduct that was happening, I think what the court did was try to do the best it could in balancing, in providing recovery for the participants because it was clear that they were at a loss. At least by $2.4 million. It was probably higher, but the District Court did the best it could with the facts it was giving. And there's one other thing that I would love to address before my time is up, and I want to talk about the applicability of a marketability discount or minority discount. And I think the District Court was clearly correct. It was not clearly erroneous for the District Court to look at certain sources. First of all, it was clear that the appellants were not the minority stockholders trying to purchase the ESOP stock. They controlled the corporation. It's clear by their behavior that they manipulated the corporation any way they wanted to. Why is that the test, though, under a minority shareholder discount? Isn't it what the buyer gets, not what the control of the shareholders? It's obvious they controlled the corporation. The question is, if someone bought their interest, would they obtain the same control? Well, I think that with a minority discount, you apply it where it is the minority who is purchasing the stock. No, you apply it when they're trying to sell small shares in terms of percentage of a corporation, less than the majority share. Because the idea is, if you're buying a corporation, especially a closed corporation, and you don't get voting control, it's not worth as much. Because you can't control the destiny of the corporation. The question here is, why do you believe that a person who is purchasing less than a majority of the shares of the corporation would be gaining control of the corporation? Well, I think that the purchasers in this case, the Diermans, were the controlling shareholders. And they were purchasing, after the purchase, they would have been the 100 percent owners of the corporation. They were buying a minority block of stock. The fair market value is a hypothetical buyer and a hypothetical seller on an arm's length transaction. Right. And that's, if I may, okay. The court had four sources to look at here, with respect to any application. They had the original TORC appraisal that did not apply any, either discount. They had Mr. TORC's expert trial opinion, which showed that he flip-flopped with the marketability. They had the secretary's expert that applied a 25 percent marketability discount on a totally different set of numbers, a much higher valuation of the company. But the most telling... Correct me if I'm wrong, but the TORC analysis was of the value of the company, right? Yes. It was not valuing a minority shareholder's interest. The TORC valuation was done for the purpose of the Diermans purchasing the ESOP stock. That's what he was hired for, even though they withheld information from him. That's the valuation he was given. And Mr. TORC, knowing that the Diermans were going to purchase the ESOP stock, the 49 percent shares, did not apply a discount. Either marketability or minority discount. But what's most convincing here is the failure of the buyers to ask for marketability or minority discount. And I think it was very reasonable for the district court to look at those four sources to say, okay, no one applied it, and I'm looking at the egregious conduct of the appellant, and I'm going to err on the side of the participants and not on the breaching fiduciaries. The court saw that at every step of this transaction, the appellant never acted in the fiduciary capacity. They acted on every conflict. And that behavior was so egregious, I think it led the district court to really look at what was happening to try to come up with a very, as close to making the participants whole as possible. I thought you said the court bent over backwards entirely in favor of the Diermans. I said that a moment ago. Not entirely in favor of the Diermans. I think the district court bent over backwards to be able to make adjustments, and he made certain adjustments without taking into account our experts report, which definitely would have valued the company higher, and that's what I meant by that, is that I think the court did try to do a balancing, and in the end, it still was going to apply the loss against the breaching fiduciaries and not have the participants take that loss. I mean, you had seven participants. Did you ask the district court to come up with the right value? I mean, the analysis of the breach of fiduciary duty is different from valuation. That's true. Those are findings of fact. When you say that the district court waited in one way or the other, doesn't that sort of indicate that the district court didn't come up with the right number, but rather favored one side or the other, which is impermissible? No. I think what the district court did was the district court looked at what was withheld for the valuation, made the appropriate adjustments given the record, and that when it made, for instance, the example is on the estimated tax liability. Mr. Vienna, the talented tax attorney, who is the person in the best position to know whether or not there was double taxation, agreed that the tax liability was $856,000. That was as close as he could get. In fact, they settled the tax liability, and it was very close to that amount of money. But the district court even allowed Mr. Vienna to produce a legal bill to say how much it would have cost to settle this claim. And he subtracted that. He made that adjustment. He made an adjustment for the overcompensation, a certain percentage of how much he was going to calculate, how much he earned each year, and came up with an excessive compensation figure. He didn't just take any number. He looked at it, and he made certain balancing adjustments. But in the end, excuse me? But your opponent is concerned that he did things without a basis. In other words, he did say it was overcompensated. And it looks to anybody looking, he was overcompensated. But his point is, he wasn't overcompensated unless an action could have been maintained to recover a portion of that amount. And there's nothing on this record that shows that there was or was anticipated an action to recover it. So how do we know he was overcompensated? On the record, the IRS said he was overcompensated. Mr. Turek himself makes the determination that he was overcompensated. But Mr. Turek, they withheld information from him, so Mr. Turek guesses of what he thinks the overcompensation was. He normalizes it to $100,000 annually, as opposed to what the correct figure was. So I do think there are facts that support that. And I think the district court made a finding that, first of all, it was alleged in the Secretary's complaint, so that everyone was on notice that the overcompensation issue or the derivative, hypothetical derivative action, I have 30 seconds left, would be used for the calculation of loss. You can go to whatever you want for your final windup. You don't have to. Okay. Thank you. As I said, the district court had four sources to look at for the marketability and picked the one that was the closest and the most reasonable. I think the district court, in the end, looked at how the appellants failed to demonstrate excuse me, let me just cut to the chase, the appellants failed to demonstrate the district court's findings, the facts should be reversed. They failed to show that there was clear error in this case. They have a very heavy burden. They were the fiduciaries to the plan, and they failed to show that there was any firm commitment in the evidence that showed that the district court had no basis for any of its findings, and I think the district court's opinion should be affirmed. I just want to focus on a couple of issues. Appellants are indeed contesting some of the facts that were recited in the district court's findings. In particular, the notion that Vienna estimated the potential tax liability at 856,000 is flatly incorrect. As counsel for appellees noted, Vienna was in the best position to estimate those because he was the tax lawyer, and the uncontroverted evidence is that he reduced the potential tax liability to 1.7 million, not to 856. In fact, that subsequent reduction was made by Ted Gehrman, again with the express purpose of providing some payments to the beneficiaries of the plan. The other issue pertains to the discount rate and the various supporting attempts by appellants to reduce the potential tax liability. The district court's failure to award that rate. Most critically, I would note that the district court made absolutely no finding on the issue of the discount rate. Instead, it simply glossed over that issue. The minority share discount and also the marketability discount. He doesn't discuss any of those. He doesn't try to cite Turek's initial methodology, which was explained at trial as not specifically addressing those issues because it was an incomplete valuation. It could only be completed upon the estimated liability of the tax claims. Let's talk about the minority shareholder discount for a second. Given the fact that you had essentially three shareholders, you've got the Durham Group, Smith Group, and the ESOP, right? Yes. And the person who bought the shares was going to control the ESOP, right? Correct. So why should there be a minority shareholder discount in this instance? I think the difference is that the... You don't automatically get it just because you own a minority of shares. The question is control. I guess the principle issue is the marketability. You have a closed market. So you're conceding that you aren't entitled to the discount? We make both claims with respect to the minority interest. What percentage did the Dearmans hold? At the time of the... Well, initially, both the Dearmans and the Smiths held slightly over 50%. Then the Smiths were bought out, were they not? Correct. Ostensibly by Dearman, at least pursuant to the corrections made about the stock repurchase. So when the Dearmans bought out the Smiths, then the Dearmans had about 51%, right? Correct. So there weren't even minority shareholders at that point, and then the rest of it was controlled by the ESOP, right? Well, I would submit that the fair market value that's to be applied to the ESOP members is the value as to their shares, and not as to the entire corporation. So we would be assuming that the minority shareholders were sharing or were selling their take, as if they were only selling their interest as opposed to... That's a good point. The principle point I want to make about the discount rate is since it was never addressed in the court's opinion, we can, I would argue, that the court in fact failed to exercise any discretion by not addressing that issue. And given that, and the failure to exercise any discretion is clearly an abuse of discretion. Absent any questions from the Court, I'll close the hearing.
judges: Farris, Fernandez, Thomas